IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ALLISON RENEE FOX, | CASE NO. 5:23-cv-580 |
| Plaintiff, | DISTRICT JUDGE DONALD C. NUGENT |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Allison Fox filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In May 2021, Fox filed an application for Disability Insurance Benefits alleging a disability onset date of April 1, 2017,[1] and claiming she was disabled due to type 1 diabetes, gastroparesis, diabetic neuropathy, persistent

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

depressive disorder, generalized anxiety disorder, chronic migraines, and asthma. Tr. 162, 171, 175. The Social Security Administration denied Fox's application and her motion for reconsideration. Tr. 59, 64. Fox then requested a hearing before an Administrative Law Judge (ALJ). Tr. 85.

In January 2022, an ALJ held a hearing. Fox and a vocational expert testified. Tr. 27–58. In March 2022, the ALJ issued a written decision finding that Fox was not disabled. Tr. 15–23. The ALJ's decision became final on February 7, 2023, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Fox filed this action on March 20, 2023. Doc. 1. She asserts the following assignment of error:

> The ALJ failed to properly develop the record when he declined to either obtain a medical source statement of Plaintiff's limitations from treating sources or order a consultative examination for an opinion of Plaintiff's limitations.

Doc. 7, at 3.

**Evidence**

*Personal and vocational evidence*

Fox was born in 1997 and was 24 years old on the date she filed her application. Tr. 33. She completed three years of college and used to work as a survey research caller, fast food cashier, customer service representative, and writing tutor. Tr. 176–77.

2

*Medical evidence*[2]

In April 2016, Fox went to the emergency room for right wrist pain after she fell while "crowd surfing" at a concert. Tr. 228–29. X-rays were negative for a fracture and Fox was advised that she likely had a soft tissue injury. Tr. 229. The doctor advised Fox to wrap her wrist in a bandage and take ibuprofen as needed for pain. Tr. 229.

Eight days later Fox returned to the emergency room for left leg swelling that began three days before her visit. Tr. 227. She had an insulin pump, and reported redness and discolored drainage at the site of the pump the day before her visit. Tr. 227. Fox also reported an episode of nausea. Tr. 227. Fox's exam showed an insulin pump over the left buttock and a small red area on Fox's thigh. Tr. 227. A "[s]mall amount of purulent fluid [wa]s obtained." Tr. 227. The doctor prescribed antibiotics and diagnosed Fox with cellulitis and a history of type 1 diabetes. Tr. 227–28.

Three years later, in April 2019, Fox saw Karla Detoya, M.D., for a follow-up diabetic visit. Tr. 591. A note lists Fox's use of an insulin pump. Tr. 591. Dr. Detoya assessed Fox with type I diabetes mellitus with hyperglycemia with long-term insulin use. Tr. 598. Fox denied any musculoskeletal, neurological, endocrinological, gastrointestinal, or psychiatric issues. Tr. 594. She denied depression, memory issues, or problems sleeping. 594. Fox's

---

[2] The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

physical and mental exam findings were unremarkable. Tr. 595. Dr. Detoya wrote that Fox's high HbA1c[3] was "putting [Fox] at risk for complications/catastrophic event." Tr. 598. Fox was advised to continue the current insulin pump setting, check her blood levels, and return in approximately three months. Tr. 598–99.

Almost two years later, in January 2021, Fox was hospitalized due to diabetic ketoacidosis (lack of insulin). Tr. 531. Fox improved with treatment and was discharged two days later. Tr. 531. Fox was assessed with diabetic ketoacidosis, "likely related to poor compliance [versus] insulin pump issue." Tr. 534. A chest x-ray after Fox complained of shortness of breath was unremarkable. Tr. 271. Fox was also assessed with elevated procalcitonin (indicting infection), migraines, and depression. Tr. 534. Fox was advised to continue medications for migraines (Topomax) and depression (Venlafaxin). Tr. 534

In April 2021, Fox saw Elizabeth Bevington, M.D., to establish care and to obtain an endocrinology referral for her diabetes. Tr. 508. Fox reported a history of diabetes with neuropathy, anxiety, depression, and migraines. Tr. 508. She said that she was doing well on her migraine medication and that she hadn't had a migraine in about a year. Tr. 508–09. At that visit, Fox denied any musculoskeletal, neurological, or psychiatric issues. Tr. 509. She reported

---

[3]     An HbA1c or A1c test shows a person's average blood sugar level for the past two to three months. *See* https://www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643 [https://perma.cc/HED8-GFXL].

bloating, constipation, and nausea. Tr. 509. Fox's exam findings, including of Fox's abdomen, were normal. Tr. 510–11.

In July 2021, Fox saw Dr. Bevington for gastrointestinal problems. Tr. 442. Fox reported constipation, constant stomach cramps, poor appetite, bloating, weakness, and feeling "more sick." Tr. 442. Dr. Bevington assessed Fox with chronic generalized abdominal pain, slow transit constipation, and type I diabetes mellitus with diabetic neuropathy. Tr. 444. Fox was listed as stable on diabetic medication, which Dr. Bevington refilled. Tr. 444. Dr. Bevington prescribed magnesium oxide for Fox's gastrointestinal issues and referred Fox to a gastroenterologist. T 444.

In August 2021, Fox saw endocrinologist James Salem, M.D., for a follow-up after a hospitalization. Tr. 418. Fox reported feet numbness and nausea but said that medication helped. Tr. 418. She had an unremarkable physical and mental exam. Tr. 419–20. Dr. Salem assessed Fox with type 1 diabetes mellitus with diabetic neuropathy and diabetic gastroparesis. Tr. 418.

*State agency review*[4]

In June 2021, the state agency doctors reviewed Fox's application, but there was no medical evidence on file. Tr. 61–62. So they found that Fox didn't have a physical or mental medically determinable impairment. Tr. 61–62. In September 2021, on reconsideration, the state agency doctors reviewed the only evidence in the record—Fox's 2016 negative wrist x-ray—and found that Fox didn't have a physical or mental medically determinable impairment. Tr. 66–68.

Later, additional evidence was added to the record, which was on file at the time of the administrative hearing. Tr. 32–33; *see also* Tr. 15, 26.

*Hearing testimony*

Fox, who was represented by counsel, testified at the telephonic administrative hearing held in January 2022. Fox stated that she is a full-time college student. Tr. 39. She lives with her fiancé and two roommates. Tr. 38. Fox said that she used to work full-time at a fast-food restaurant, but when she started college, she switched to part-time work. Tr. 40–41.

---

[4]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

For her diabetes, Fox has an insulin pump. Tr. 42. She began using the insulin pump about eight or nine years before the hearing. Tr. 42. She explained that she is what is called a "brittle diabetic"—her blood sugar levels "are always going to be … up and down." Tr. 42. When Fox wakes up in the morning, she checks her blood sugar levels and takes her medication. Tr. 42. Her blood sugar is "usually kind of high in the morning," so she is "usually pretty sick." Tr. 42. She lies down for about an hour or so after taking her insulin, and then she is "usually pretty okay to start [her] day." Tr. 42. Separately, she has nausea from gastroparesis. Tr. 43, 52.

Fox stated that she cooks and eats healthy food every day to maintain her diabetes. Tr. 43. She has a Planet Fitness membership and exercises there and at home. Tr. 44. At the time of the hearing Fox wasn't working, so it's her "job" to do chores around the house. Tr. 51. When asked about neuropathy, Fox stated that she mostly has neuropathy in her feet, but that she takes Gabapentin, which "helps immensely." Tr. 44. Also, she can "walk it off." Tr. 44. The neuropathy mostly occurs at night, and she can use a heating pad and "sleep it off." Tr. 45.

When asked how long she could walk, Fox stated that she can walk for about 15 minutes before she would want to take a break to sit and drink water. Tr. 45. She doesn't experience problems using her fingers or hands. Tr. 46. When asked if her migraines were still an issue, Fox stated, "[n]ot so much, with the medications I'm on now." Tr. 47. But when she gets nervous or

stressed, she gets migraines despite her medication, and is bedridden. Tr. 47. Fox estimated that she had four migraines in the last month. Tr. 47. They last for about an hour or two. Tr. 47. When asked about her asthma, Fox stated that she needs to use her inhaler in the winter. Tr. 47.

When asked about whether her mental health issues impair her ability to work, Fox stated that her mental health issues caused her to take too many days off. Tr. 48. She called them "diabetes days" and said that she's too depressed to go to work. Tr. 48. Fox stated that she has trouble concentrating. Tr. 49. She's "really good with people" and has a group of friends who she sees regularly. Tr. 50, 52. She sees a mental health provider and takes medication for depression and anxiety. Tr. 50. The medication helps. Tr. 50. Fox has panic attacks at least once a day but has become adept at managing them. Tr. 50.

The ALJ found that Fox had no past relevant work. Tr. 55. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Fox could perform work if the individual had the limitations assessed in the ALJ's residual functional capacity[5] determination, described below. Tr. 55. The vocational expert

---

[5]     A residual functional capacity (RFC) is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

answered that such an individual could perform the following jobs: merchandise marker, sales attendant, and routing clerk. Tr. 56.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2020.[6]
>
> 2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of April 1, 2017 through her date last insured of September 30, 2020 (20 CFR 404.1571 *et seq.*).
>
> 3. Through the date last insured, the claimant had the following severe impairments: diabetes mellitus, asthma, migraine headaches, anxiety disorder, depression (20 CFR 404.1520(c)).
>
> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except with the following additional limitations. The claimant can frequently handle and finger with the bilateral upper extremities. The claimant can frequently climb ramps and stairs, and can occasionally climb ladders, ropes, or scaffolds. The

---

[6]    To be entitled to Disability Insurance Benefits, a claimant must be a wage-earner who accumulated sufficient earning credits and became disabled before the end of his or her insured date. *See, e.g.*, 42 U.S.C. § 423(c)(1); *see also Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); Soc. Sec. Disab. Claims Prac. & Proc. § 5:3 (2nd ed. 2022).

claimant must avoid concentrated exposure to humidity, extremes of hot and cold, dust, odors, fumes, and pulmonary irritants. The claimant can perform simple, routine tasks, and make simple, work-related decisions. The claimant can tolerate few changes in a routine work setting.

6.  The claimant has no past relevant work (20 CFR 404.1565).

7.  The claimant was born [i]n … 1997 and was 23 years old, which is defined as a younger individual age 18–49, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education (20 CFR 404.1564).

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from April 1, 2017, the alleged onset date, through September 30, 2020, the date last insured (20 CFR 404.1520(g)).

Tr. 17–23.

## Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden

shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

### Discussion

In this case, there is no medical opinion evidence. Tr. 21. Fox argues that the ALJ "failed to properly develop the record when he declined to either obtain a medical source statement of [Fox's] limitations from treating sources or order a consultative examination for an opinion of [Fox's] limitations." Doc. 7, at 8. Fox's use of the word *declined* suggests that Fox asked the ALJ to obtain a medical opinion. But Fox never asked the ALJ to obtain a medical opinion. So what Fox is really arguing is that, despite Fox's silence on the issue, the ALJ should have reached out to Fox's treating source for an opinion or ordered a consultative exam.

*The ALJ did not have a heightened duty to develop the record*

While an ALJ must ensure that every claimant receives a "full and fair hearing," the ultimate burden of proving entitlement to benefits lies with the claimant. *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023); 20 C.F.R. §

404.1512(a)). Although social security proceedings are inquisitorial rather than adversarial, that doesn't mean that the ALJ advocates for the claimant. *See Moats*, 42 F.4th at 563 ("Promoting the claimant's case, of course, is not the ALJ's obligation. The ALJ, remember, is a neutral factfinder, not an advocate.") (citing *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (plurality opinion).

It is only under "extreme circumstances"—not present here—that the ALJ could be said to have a "special duty" to help develop the record. *See Moats*, 42 F.4th at 563–64 (discussing *Lashley v. Sec'y of Health and Human Servs*., 708 F.2d 1048, 1051–52 (6th Cir. 1983)). Fox, however, ignores *Moats* and its relegation of *Lashley* to "extreme" situations, cites *Lashley*, and argues that the ALJ erred by not developing the record. Doc. 7, at 8–10. To the extent that Fox argues that the ALJ erred under *Lashley*, her argument fails. In *Lashley*, the claimant wasn't represented by counsel and only had a fifth-grade education. 708 F.2d at 150–52. A series of strokes left Lashley unable to articulate his thoughts and impaired his ability to read. *Id*. Here, in contrast, Fox was represented by counsel and was a full-time college student who could articulate her thoughts while testifying. Tr. 36–53. So Fox hasn't shown that hers was an "extreme" situation in which the ALJ had a heightened duty to develop the record in her case. *See Moats*, 42 F.4th at 564 (distinguishing *Lashley* and declining to impose a duty-to-develop-the record-obligation even though the claimant was unrepresented).

14

Moreover, at the hearing Fox's counsel and the ALJ discussed Fox's relatively sparse medical record. Tr. 32–34. Counsel asked for an additional two weeks so that he could try to get from Fox more information about where Fox had treatment. Tr. 33. Counsel stated that he wasn't sure "if we'd get anything back," but counsel was working with Fox to determine where else Fox sought treatment and "there is something potentially missing." Tr. 33. The ALJ offered to postpone the hearing pending any additional records, but counsel stated that he wanted to proceed that day with the hearing.[7] Tr. 34. The ALJ said that he would leave the record open for 30 days—two weeks longer than counsel requested—to "give you as much time as you could need to … try to figure things out." Tr. 35.

But Fox didn't submit additional records to the ALJ, the Appeals Council, or this Court. Fox didn't ask for more time to obtain records or alert the ALJ to a problem she had obtaining records from providers. Rather, Fox's difficulty obtaining records was due to the fact that counsel didn't know where to find them or even if they existed. Fox hasn't shown how the ALJ could have helped her with that. *See, e.g., Davidson v. Comm'r of Soc. Sec.*, No. 3:22-cv-938, 2023 WL 4078203, at *12 (N.D. Ohio May 15, 2023) (rejecting the claimant's argument that the ALJ failed to develop the record; "Davidson seeks to broadly interpret this general obligation to require the ALJ to act

---

[7]     Counsel explained that he "d[id]n't think the testimony … is going to be changed by the records." Tr. 34.

independently to obtain medical records even where a claimant was represented by counsel, did not advise the ALJ of any difficulties obtaining the records, and did not request the ALJ's assistance in securing the records") (collecting cases), *report and recommendation adopted*, 2023 WL 5948122, at *3 (N.D. Ohio Sept. 13, 2023); *Owens v. Berryhill*, No. 1:18-cv-1043, 2019 WL 2465229, at *13 (N.D. Ohio Feb. 13, 2019) (finding that the ALJ's RFC was supported by substantial evidence and that, "[m]oreover, Owens, who was represented by counsel at the hearing, did not request a consultative examination or otherwise suggest the medical record was insufficient for the ALJ to make a disability determination," *report and recommendation adopted*, 2019 WL 1929695 (N.D. Ohio Apr. 30, 2019). Fox provides no basis to find that an ALJ must engage in a fact-finding process to discover unknown providers for a represented claimant.

*The ALJ was not required to obtain a medical opinion*

Fox hasn't shown that the ALJ was required to obtain a medical opinion on Fox's behalf. In fact, Fox concedes that it was within the ALJ's "discretion" to request a consultative exam. Doc. 7, at 9 (citing 20 C.F.R. § 404.1512(b)(2) ("We *may* ask you to attend one or more consultative examinations at our expense") (emphasis added)). Fox doesn't identify any other regulation showing that the ALJ must obtain a medical opinion and, if so, under what circumstances.

And yet, Fox asserts that "[b]ecause the record lacks a medical opinion of [Fox's] physical or mental capabilities from any medical source, the ALJ erred by failing to further develop the record." Doc. 7, at 9 (citing 20 C.F.R. § 404.1512(b)). In response, the Commissioner points out that an ALJ isn't required to base an RFC on a medical opinion. Doc. 10, at 5 (citing *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding"); *see also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018); *Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015) (affirming that "neither the applicable regulations nor Sixth Circuit law limit the ALJ to consideration of direct medical opinions on the issue of RFC" and, moreover "none of the[] cases [cited by the claimant] even remotely suggests that an ALJ must, as a matter of law, seek out a physician's medical opinion where one is not offered."); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (rejecting the plaintiff's argument that the ALJ is required "to base her RFC finding on a physician's opinion").

In her reply brief, Fox again concedes that point. *See* Doc. 11, at 1 ("[Fox] has made no such contention that such a bright line [as described in *Tucker*] exists."). But then Fox block-quotes a case that—she says—is analogous to her case, and which is contrary to her concession. *Id.* at 1–2 (quoting *Steadman v. Comm'r of Soc. Sec.*, No. 1:10-cv-801, 2011 WL 6415512, at *12 (S.D. Ohio Nov.

17

14, 2011), *report and recommendation adopted in part sub nom. Steadman v. Astrue*, No. 1:10-cv-801, 2011 WL 6415508 (S.D. Ohio Dec. 21, 2011)). Even worse, the language from *Steadman* that Fox quotes—the magistrate judge finding that the ALJ erred because there was no medical opinion evidence in the record to support the ALJ's physical RFC—was expressly rejected by the district court. The district court explained:

> [The] Report and Recommendation seems to indicate that the ALJ was required to obtain a medical source opinion in developing Plaintiff's physical RFC. It is well-established, however, that the claimant bears the burden of proving his RFC. *Her v. Commissioner of Social Sec.*, 203 F.3d 388, 391 (6th Cir.1999). If the claimant fails to obtain an official RFC, and relies on other evidence to prove his impairments, the Commissioner is not required to prove his RFC at the fifth step. *Id*.

*Steadman v. Astrue*, No. 1:10-cv-801, 2011 WL 6415508, at *9 (S.D. Ohio Dec. 21, 2011).

Fox contends that in two circumstances an ALJ "must" obtain opinion evidence. Doc. 7, at 10 (citing *Timothy R. J. v. Comm'r of Soc. Sec.*, No. 3:22-cv-216, 2023 WL 2258524, at *3 (S.D. Ohio Feb. 28, 2023)). In *Timothy R. J.*, the court wrote that, although the Sixth Circuit has held that an ALJ is not required to base his or her RFC on a medical opinion, unpublished district court opinions have carved out a rule that the ALJ "must obtain opinion evidence to satisfy his duty to develop the record in at least two circumstances." 2023 WL 2258524, at *3. "One circumstance arises when an ALJ is required to make medical judgments about a claimant's functional abilities by interpreting

18

raw medical data." *Id.* (citing *Gonzalez v. Comm'r of Soc. Sec.*, 3:21-cv-93, 2022 WL 824145, at *8 (N.D. Ohio Mar. 18, 2022) (in turn citing *Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, at *9 (N.D. Ohio Sept. 29, 2021), and *Mascaro v. Colvin*, No. 1:16-cv-436, 2016 WL 7383796, at *11 (N.D. Ohio Dec. 1, 2016), *report and recommendation adopted sub nom. Mascaro v. Comm'r of Soc.*, 2016 WL 7368676 (N.D. Ohio Dec. 20, 2016)). A second circumstance is "when a critical body of the objective medical evidence is not accounted for by a medical opinion and there is significant evidence of potentially disabling conditions." *Timothy R. J.*, 2023 WL 2258524, at *3 (internal quotation marks omitted) (quoting *Gonzalez* (in turn quoting *McCauley v. Comm'r of Soc. Sec.*, No. 3:20-cv-13069, 2021 WL 5871527, at *14–15 (E.D. Mich. Nov. 17, 2021)), and citing *Kizys v. Comm'r of Soc. Sec.*, No. 3:10-cv-25, 2011 WL 5024866, at *2 (N.D. Ohio Oct. 21, 2011) (in turn quoting *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908, 912 (N.D. Ohio 2008)); *see also* Doc. 7, at 9–10 (Fox citing the same cases). The problem for Fox is that the rule for which she advocates does not enjoy the support of binding legal precedent.

Take the statement in *Timothy R. J.* that an ALJ *must* obtain opinion evidence when the ALJ is "required to make medical judgments about a claimant's functional abilities by interpreting raw medical data." 2023 WL 2258524, at *3. In support, the court cited *Gonzalez, see id.*, which, in turn, relied on *Alexander* and *Mascaro, see id.* But the issue in *Alexander* and

*Mascaro* wasn't whether the ALJs were required to obtain opinion evidence. *See Alexander*, 2021 WL 4459700, at *7–9; *Mascaro*, 2016 WL 7383796, at *9–11. And *Gonzalez* itself didn't rest it's holding on the *raw medical data* circumstance, but rather the *critical body* circumstance. 2022 WL 824145, at *9–10.

The second circumstance described in *Timothy R. J.* stems from the rule created in *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008). In *Deskin*, the court held that:

> As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases where the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

605 F. Supp. 2d at 912 (quoting *Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 17 (1st Cir. 1996)). But *Deskin* isn't controlling, and it has received mixed reviews. *See, e.g., Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) ("The Court finds, however, that *Deskin* … is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals."); *see also Berrier v. Comm'r of Soc. Sec.*, No. 3:20-cv-1655, 2021 WL 6881246, at *6 (N.D.

Ohio Sept. 10, 2021) (citing cases that followed *Deskin* and those that did not), *report and recommendation adopted*, 2022 WL 189855 (N.D. Ohio Jan. 21, 2022). Indeed, "[a]fter some criticism from other district courts in the Sixth Circuit, the *Deskin* court [in *Kizys*] clarified its decision" to hold "that *Deskin potentially* applies in only two circumstances." *Berrier*, 2021 WL 6881246, at *6 (emphasis added); *see also Kizys*, 2011 WL 5024866, at *2 ("Properly understood, *Deskin* sets out a narrow rule that does not constitute a bright-line test" and "*potentially* applies only when an ALJ makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence") (emphasis added). And then the rule announced in *Kizys* that *potentially* applied eventually morphed into a requirement. *See Timothy R. J.*, 2023 WL 2258524, at *3 ("A medical opinion *must* also be obtained when "a 'critical body' of the 'objective medical evidence' is not accounted for by a medical opinion and there is significant evidence of potentially disabling conditions.") (emphasis added).[8]

The bottom line is that various courts apply various standards from largely unpublished district court opinions. I return to the language of the regulations and Sixth Circuit authority, which make clear that the burden to

---

[8]     Meanwhile, 20 C.F.R. § 416.919a provides examples of some situations that *may* require an ALJ to purchase a consultative exam. Fox doesn't cite 20 C.F.R. § 416.919a or state whether or which of the enumerated situations she thinks apply to her case.

prove her case rests on the claimant, not the ALJ. *See Moats*, 42 F.4th at 563; 20 C.F.R. § 404.1512(a). Further, "the regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. § 416.917(a)). While the ALJ has a duty to conduct a "full inquiry," that duty "does not require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision." *Landsaw*, 803 F.2d at 214 (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)); *see also* 20 C.F.R. § 416.919a(b)(1) (an ALJ may be required to obtain a consultative exam when "[t]he additional evidence needed is not contained in the records of [the claimant's] medical sources").

Here, the ALJ had sufficient evidence to make his determination and the record doesn't establish that a consultative exam was necessary. *See Landsaw*, 803 F.2d at 214; 20 C.F.R. § 416.919a(b). At step two, the ALJ listed Fox's severe impairments: diabetes mellitus, asthma, migraine headaches, anxiety disorder, and depression. Tr. 17. The ALJ wrote that Fox's cellulitis was not severe "as there is not sufficient evidence documenting how related symptoms significant[ly] affect [Fox's] ability work." Tr. 17. The ALJ considered at step three whether Fox's impairments satisfied the requirements of a listed impairment and found that they did not. Tr. 18–19.

The ALJ then assessed Fox's RFC and explained, in detail, the medical evidence supporting that RFC. Doc. 20–22. The ALJ wrote that Fox alleged at the hearing that her primary diabetes symptoms included "gastrointestinal pain, bouts of hyperglycemia, fatigue, and pain." Tr. 20. The ALJ found that Fox's allegations "[t]o some extent" are corroborated in the record—Fox's reports of abdominal distress and "at least one ICU admission" in January 2021 due to high blood glucose levels.[9] Tr. 20. But the ALJ also observed that at Fox's January 2021 ICU admission, Fox said that her "fiancé may have thrown out her insulin prior to admission," which, the ALJ found, "depriv[ed] her of access to the medications that otherwise are shown to control her blood glucose levels at least somewhat." Tr. 20–21. The ALJ also acknowledged that, regardless of what precipitated it, Fox's hospitalization was "a serious event," but that "elsewhere in the record [Fox] has largely shown little clinical sign of physical complication due to diabetes." Tr. 21–22. The ALJ explained that Fox "[o]ccasionally" showed signs of feet numbness and left leg swelling, but those findings were outweighed by more frequent exam findings of "intact strength, pulses, range of motion, and sensation in the lower extremities." Tr. 22. The ALJ found that the record didn't show signs of frequent gastrointestinal distress either, contrary to Fox's allegations that gastrointestinal distress is the primary complication of Fox's diabetes. Tr. 21. Nevertheless, the ALJ

---

[9]     Fox's January 2021 hospital admission occurred about three-and-a-half months past Fox's last insured date, September 30, 2020. Tr. 17.

limited Fox to performing work at the light exertional level, with additional climbing and handling limitations "due to potential neuropathy concerns." Tr. 21.

The ALJ found that the record showed that Fox's migraines were "chronic but stable, and largely controlled by Topomax," consistent with Fox's hearing testimony. Tr. 21. Still, the ALJ found that Fox was entitled to "precautionary limitations on working near hazards." Tr. 21. The same was true for Fox's asthma symptoms—the record showed that Fox's asthma symptoms were "chronic" but "stable and controlled with use of an albuterol inhaler." Tr. 21. Fox's testimony that her inhaler helped corresponded to treatment records indicating the same. Tr. 21. The ALJ noted that a chest x-ray had been unremarkable. Tr. 21. He explained that the limitation to light work also accounted for Fox's asthma, and further limited Fox to avoiding concentrated exposure to respiratory irritants. Tr. 21.

As for Fox's mental health, the ALJ commented that the record showed no direct treatment for depression and anxiety other than prescribed medications. Tr. 21. Although Fox alleged daily panic attacks, the ALJ wrote that the record didn't support that allegation. Tr. 21. Moreover, the ALJ found that Fox's alleged daily panic attacks were inconsistent with Fox's ability to attend college full time. Tr. 21. The ALJ commented that the record showed "reports of some anxiety and feelings of restlessness, but not with a frequency that indicates marked deficits in mental work ability." Tr. 21. The ALJ

considered Fox's "allegations of poor stress tolerances, panic attacks, and depressed moods in a light most favorable to her," but Fox's lack of additional treatment for those symptoms undercut Fox's allegations. Tr. 21. Even so, the ALJ limited Fox to simple, routine tasks and making simple, work-related decisions. Tr. 21. And the ALJ said that Fox "can tolerate few changes in a routine work setting to reduce the amount of stress she faces daily." Tr. 21. The ALJ concluded:

> In sum, the above residual functional capacity assessment is supported by the objective evidence of record. As discussed above, the claimant's allegations are somewhat inconsistent with what the objective evidence suggests in terms of functional restriction. While the evidence supports the existence of her reported severe impairments, it does not support the specifics of her allegations concerning the severity and frequency of the related symptoms. Ultimately, I find that the evidence of record does not support greater restrictions than detailed above in the residual functional capacity finding. In reaching this conclusion, I have reviewed the entirety of the record, considered each of the claimant's subjective complaints, and have considered each of the claimant's medically determinable impairments.

Tr. 22.

Fox doesn't challenge the ALJ's characterization of the record evidence, the summary of Fox's impairments and testimony, or the evaluation of Fox's reports of symptoms. Rather, Fox only asserts, without further explanation, that the ALJ relied in error "upon his own interpretation of the medical evidence" and "raw medical data." Doc. 7, at 12. Fox doesn't supply a definition

for "raw medical data." And her failure to identify with specificity the portion of the ALJ's decision that she believes is erroneous is fatal to her claim. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

In her reply brief, Fox for the first time alleges that the ALJ's "RFC is clear and highly-specific but what remains a mystery is the connection between said RFC and the evidence of record." Doc. 11, at 2. Fox's argument is forfeited because Fox raised it for the first time in her reply brief. *See United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) ("An argument first presented to the Court in a reply brief is waived."). Even so, Fox's argument fails. As detailed above, the ALJ explained each specific limitation in his RFC.

Fox also asserts for the first time in her reply brief that the ALJ wasn't "qualified to make a commonsense judgment about, for example, the effects of [Fox's] documented diabetic neuropathy of the feet on her ability to stand and walk in a competitive work setting." Doc. 11, at 2. Even if the Court considers this improperly raised argument, it fails. The ALJ discussed Fox's neuropathy. Tr. 21. The ALJ accurately stated that Fox "has largely shown little clinical sign of physical complication due to diabetes." Tr. 21. And the ALJ acknowledged that Fox occasionally showed signs of foot numbness, but more

26

frequently had normal objective exam findings, including intact strength and sensation. Tr. 21. Moreover, Fox herself testified that she mostly experienced foot numbness at night, medication helped "immensely," and she could usually "sleep it off" or "walk it off."[10] Tr. 44–45. Fox hasn't shown that a consultative exam was *necessary* for the ALJ to make a decision in her case. *Landsaw*, 803 F.2d at 214; *see* 20 C.F.R. § 416.919a(b); *see also Brown,* 602 F. App'x at 330–31 (affirming the district court's rejection of a magistrate judge's finding "that the ALJ had erred as a matter of law by 'determining Ms. Brown's physical functional capacity based only on treatment records and Ms. Brown's testimony'"); *Steadman*, 2011 WL 6415508, at *9 (holding that where the ALJ evaluated the claimant's complaints of pain and reported limitations and found that the records showed that medication resolved the claimant's symptoms, the ALJ's RFC was supported by substantial evidence and the ALJ wasn't required to obtain a medical opinion).[11]

---

[10]    Again, Fox's counsel declined the ALJ's invitation to postpone the hearing pending counsel obtaining any additional records. Tr. 34. Counsel explained that he "d[id]n't think [Fox's] testimony … is going to be changed by the [possibly outstanding] records." Tr. 34. In other words, counsel chose to go forward relying, in large part, on Fox's testimony to support her disability claim. Fox should not be permitted to obtain reversal based on her counsel's decision. *See Allen v. Comm'r of Soc. Sec.*, No. 1:16-cv-170, 2016 WL 6471092, at *5 (W.D. Mich. Nov. 2, 2016) ("Courts generally do not tolerate sandbagging.").

[11]    Even if the Court applies the case law that Fox advances, Fox's claim would still fail because Fox hasn't shown that the ALJ interpreted "raw medical data" or that the record shows "significant evidence of potentially disabling conditions." *See Timothy R. J.*, 2023 WL 2258524, at *3.

Finally, in support of her argument that the ALJ wasn't qualified to assess limitations from Fox's neuropathy, Fox cites *Phelps v. Comm'r of Soc. Sec. Admin.*, No. 1:21-cv-2295, 2022 WL 18395824 (N.D. Ohio Nov. 15, 2022), *report and recommendation adopted*, 2023 WL 316016 (N.D. Ohio Jan. 18, 2023). Doc. 11, at 2–3. In *Phelps*, the court found that the ALJ "claim[ed]" that the record contained no evidence of Phelps's objective exam findings, "[b]ut the record plainly contain[ed] such clinical findings and other relevant clinical findings the ALJ did not acknowledge." 2022 WL 18395824, at *9. The ALJ based his decision on the fact that Phelps had no MRI testing "that one would expect if the claimant had symptoms that were of a disabling nature"—but the court pointed out that there *was* MRI testing in the record that the ALJ ignored. *Id*. Here, Fox doesn't allege that the ALJ ignored any evidence. So *Phelps* doesn't apply.

Fox also relies on *Gentry v. Comm'r of Soc. Sec.*, No. 1:17-cv-1182, 2018 WL 4305213, at *4 (N.D. Ohio Sept. 10, 2018), Doc. 11, at 3, but *Gentry* isn't on point. In *Gentry* the court found that the ALJ improperly relied on state agency reviewers' opinions when subsequent evidence showed that the claimant's condition worsened. 2018 WL 4305213, at *4–5.

All told, Fox's brief is long on generalizations and quotes from other cases, but short on specifics about where Fox believes the ALJ went wrong in this case. Fox hasn't shown that the ALJ violated his duty to develop the record or that he was required to obtain a medical opinion. Fox hasn't shown that the

ALJ's RFC is unsupported by substantial evidence. So the ALJ's decision should be affirmed.

### Conclusion

For the reasons explained above, I recommend that the Commissioner's decision be affirmed.

Dated: October 10, 2023

      */s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).